**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CHARLES SCOTT MULLINS,

        Plaintiff,

-vs-

CITY OF INKSTER, et al.,

        Defendants.

_____/

CASE NO.  05-CV-73452

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

**OPINION AND ORDER GRANTING**
**DEFENDANT CITY OF INKSTER'S MOTION FOR SUMMARY JUDGMENT**

      Before the Court is Defendant City of Inkster's August 1, 2007 Motion for Summary

Judgment. (Doc. No. 55). Defendant Inkster Police Officer James Beebe filed a

Response/Concurrence to Inkster's Motion on August 30, 2007.[1] Plaintiff Charles Scott Mullins

("Plaintiff") filed a Response to Inkster's motion on December 15, 2007.[2] The Court held a

motion hearing on February 15, 2008. Having considered the entire record, and for the reasons

that follow, the Court GRANTS Inkster's motion; the case against Defendant Beebe will proceed

to trial.

**I.      BACKGROUND**

      This case arises from Plaintiff's allegations that Beebe arrested him without probable

cause and used excessive force during the arrest.

---

[1]      At the motion hearing, Beebe's counsel confirmed that his filing was not to be considered
as a motion for summary judgment.

[2]      On December 20, 2007, the Court requested that the parties submit pleadings connected
with a prior state court case involving the parties. On January 2, 2008, the Court requested that
the Inkster and Plaintiff submit supplemental briefs on whether the issues of res judicata and/or
collateral estoppel should bar Plaintiff's claims against Inkster. Both parties submitted the
requested state court pleadings and supplemental briefing.

At the time of the incident in question, Plaintiff was a resident of the City of Taylor in Wayne County, Michigan. (Compl. ¶ 4). On or about October 30, 2004, Plaintiff, his two children, Sarah and Kaitlyn, and his fiancée Grace Cho went to a video store. (Def. Br. Ex. C, Mullins Dep. 77-78). Upon exiting the store and returning to the car, Sarah began to get upset and would not sit down in her car seat. (*Id*. at 79). Cho unsuccessfully attempted to seat the child and raised her hand to spank Sarah – but Plaintiff blocked Cho's hand from hitting the child. (*Id*.). According to Plaintiff, this upset Cho. On the way back to Plaintiff's home, an argument ensued in the car, and Plaintiff "raised [his] voice and told everyone to be quiet." (*Id*. at 81).

Upon arriving home, Cho got out of the car and began to walk away. (*Id*. at 82). Plaintiff emerged from his car and unlocked the front door of his house. (*Id*. at 83). Plaintiff pulled his car up to Cho and told her to go back home. (*Id*.). When Cho kept walking down the street, Plaintiff went back to his house and locked the door. (*Id*.). Plaintiff then followed Cho in his car, pulled into a Burger King parking lot, and asked Cho to get back inside the car. (*Id*. at 83). Cho continued to walk down the street, and Plaintiff pulled into the parking lot of a Ramchargers store. (*Id*. at 85). Plaintiff pulled his car out of the parking lot around to Empire Street, that runs behind Ramchargers, to follow Cho. As he proceeded on Empire, his car slid into a ditch on the left side of the road. (*Id*. at 85-86).

Plaintiff described what happened next:

Q:   Okay. And your children are in the car at the time still?
A:   Yes, so that – you know, I'm like oh great, you know. I get out of the car. I walk over to Grace. I walk over to Grace to reach out to grab her and say come on, let's – you know, let's go. Get in the – you know, let's walk home. She steps back and falls, okay. And she says, "Get away from me. You can't hit me." Okay. That was her words right there.
Q:   Did she say it loudly?
A:   Yes, she screamed it.
. . . .
A:   She was upset because I knocked her arm from hitting Sarah.

```
Q:    Okay. And she fell back?
A:    She fell – she fell backwards.
Q:    Okay. And what was behind her?
A:    Nothing. She fell on the lawn. This was –
Q:    What part of her body did she fall on?
A:    Her butt. You know, just fell –
```

(*Id*. at 86:11-22; 87:1-7). Plaintiff further denied ever making any physical contact with her. (*Id*. at 141).

Christopher Rekuc was working at Ramchargers at the time of the incident. (Def. Br. Ex. B, Rekuc Dep. 5). While talking to customers inside the business, Rekuc heard "some arguing going on" outside. (*Id*.). Rekuc observed Plaintiff in his car driving alongside Cho in the parking lot, and then Cho walking towards Empire Street. (*Id*. at 5-6). Rekuc saw Plaintiff turn onto Empire Street at a "pretty high rate of speed" and then into a four or five-foot ditch running next to the street. (*Id*. at 6, 9, 11). Plaintiff then emerged from his car. (*Id*. at 6). Rekuc stated that at this point he was standing by Ramchargers' glass doors with the customers observing the events. (*Id*.). Rekuc could not make out what the couple were saying but could hear them "yelling." (*Id*. at 7). Although the cars in Ramchargers' parking lot partially obscured his view, Rekuc saw Plaintiff walking quickly up to Cho, Plaintiff making a "twisting motion," and then Cho falling to the ground. (*Id*. at 15-17). Rekuc assumed that Plaintiff had kicked Cho. (*Id*. at 15). One of the customers ran towards Cho to see if she was okay. (*Id*. at 19). After a few minutes, the customer returned and told Rekuc that Cho was crying, but she indicated that she did not need any help. (*Id*. at 20). Rekuc next noticed that a pickup truck was attempting to pull the car out of the ditch, but the car pulled the truck into the ditch. (*Id*. at 21). Rekuc said another employee called Defendant Beebe to tell him what was going on. (*Id*. at 23).

William Lewis testified that Beebe, Scott Lewis, and he were travelling together in Beebe's pickup truck. (Def. Br. Ex. D, W. Lewis Dep. 6-7). William indicated that either Beebe

or his son Scott received a phone call from a Ramchargers employee stating that a man was "beating his girlfriend and kicking her[.]" (Lewis Dep. 9).

Scott Lewis testified that the three saw the car in the ditch on the way to Burger King. (Def. Br. Ex. E, S. Lewis Dep. 7-8). Scott stated that he received a phone call from an employee at Ramchargers, while the three had parked Beebe's truck on a side street near the car. (*Id*. at 6).

Beebe testified that Eric from Ramchargers called Scott's phone. Scott then handed his phone to Beebe to explain the situation. (Def. Br. Ex. F, Beebe Dep. 19-20). Beebe testified the following as to the events leading up to the incident:

> A: Myself, Scott and Dale went to Ramchargers early in the morning, that same day. We were there. We left Ramchargers. We drove to Burger King, which is 3-400 yards down the roadway, at the corner of Allen and Northline, to get lunch. Time elapsed, 15-20 minutes at the most. We circled back down Allen. As we're passing Ramcharger (sic) again, we now see a – a – what would be a gold 4-door car in the ditch, as well as a female standing on the other side of the guardrail, talking on the phone; upset in nature. I pull onto Empire to see if I can give possible assistance; see what's going on. At which time, while I'm parked on Empire watching this – her upset on a cell phone, a gentleman walking back and forth around the car tryin' to hook it up, I receive a phone call from the gentleman inside Ramchargers.
>
> . . . .
>
> A: Eric told me on the phone that – pertaining to the – the incident, "We were sittin' there" – that basically, he advised me that they had witnessed, I would now know him to be as [Plaintiff], pull up into the parking lot of Ramchargers, almost hit – well, the way he explained it, "He tried to hit her with the fuckin' car," quote/unquote, in front of their door; then that they – well, they got into an argument in their parking lot; she walked away from it along the fence; he whipped out of the parking lot; she then was walking towards – I guess the street is Empire; he pulled out onto Allen screeching his tires; whipped into Emp – whipped onto Empire, and tried to hit her with his car, on Empire. That's how he ended up in the ditch, and on top of that, they said, "Hey, man, by the way, there was two kids in the backseat of the car when they were in the parking lot of Ramchargers."

(*Id*. at 23:24-25, 24:1-14; 19:23-25, 20:1-13).

Plaintiff testified that a man came over to him to check on the situation, and Plaintiff told him, "Go away. This is none of your business." (Mullins Dep. 88). Plaintiff then walked with his children back to this house. (*Id*. at 90). Plaintiff fetched his Toyota pickup truck from his backyard and returned to the ditch to attempt to recover his car. (*Id*. at 90-91). Plaintiff tried to pull his car out of the ditch, but managed to get his pickup truck stuck in the ditch as well. (*Id*. at 92). At this point, Bill and Delores Tromblay, neighbors of Plaintiff, arrived on the scene. (*Id*. at 91-92).

Tromblay used his motorhome to pull Plaintiff's pickup truck out of the ditch. (*Id*. at 93). Bill then helped Plaintiff with removing the car from the ditch. (*Id*. at 94). At this time, Cho was standing off to the side of the car. (*Id*. at 94). Plaintiff noticed that employees of Ramchargers were observing their actions. (*Id*. at 95).

Plaintiff testified the following as to the incident with Beebe:

A:      This pickup truck's sitting here, this big, white Ford pickup truck which is James Beebe's truck.

Q:      Okay.

A:      And I'm like who's this now. I stand up and here's Mr. Beebe leaning over [Cho]. She's sitting in the passenger side of Bill's truck. I go, who's this guy. I walk up and like, "Excuse me. Who are you?" Like that. As I walk up, I petted his dog on the top of – I kind of like put my hand out towards the dog because there was a dog standing there.

Q:      Okay. Did you see when Officer Beebe got out of his truck and the dog got out of the truck?

A:      No, no, I did not see him. All I know is I turned around and there he was.

. . . .

A:      So I put my – I kind of put my hand out. The dog was friends. So I walked up and I was like, "Excuse me. Who are you?" He turns around. He grabs a hold of me and whips me –

Q:      Where did he grab a hold of you at?

A:      By the – by the shirt, and just threw me against the truck. Didn't tell me who he was. Never said a word, okay. This was the words out of his mouth – can I say this?

Q:      Yeah, tell us what –

A:      He goes, "Do you want to hit fuckin women?" Like that. And that was the words out of his mouth.

. . . .

A:    He never said I was an officer. He said do you want to hit women – or you want to hit women, like that, f-ing women.

Q:    Right. And then what did you say if anything?

A:    I'm not sure if – I mean I kind of – that – that's right when I started to get upset. Right there is when I started to get upset. That's – we got into a scuffle. I'm not sure if I hit him. I'm not sure what happened from there. He started to try to grab a hold of me. I'm like "Who are you? Who are you?" I'm trying to get away from this guy. I don't know –

. . . .

Q:    When you say a scuffle started, what was the first thing that either one of you did at that point?

A:    You know, I got upset. Of course, I mean this guy whipped me against a car so I – I don't know if I swung at him. I don't know – you know what I mean. It kind of turned into – before I knew it, we were in front of the truck and he pulls out of a pair of handcuffs, and I'm screaming, "Call the Taylor Police," you know.

. . . .

Q:    Okay. So is it your recollection that you swung at Office Beebe?

A:    I'm not – I really don't believe I did. I'm not sure if I did or not.

Q:    You're not sure how this all started then?

A:    I mean because – yeah. I mean I know he swung at me against the car, and I pushed him away or something. I don't know if I hit him.

. . . .

A:    He was just trying to grab a hold of my arms and stuff, and he threw me against the hood of the truck, and I – all the time I was screaming like who are you, who – you know who are you, get – and all of a sudden the dog started biting me as we were going around.

. . . .

Q:    What are you doing at this point?

A:    I was yelling, "Who are you? Get off me." You know, he pulls out a pair of handcuffs and the dog bit me all the meanwhile while this is –

Q:    Are you still pushing him away from you?

A:    I'm trying to get away from him, yeah. That's – I don't know who this guy is, you know.

. . . .

Q:    -- and the dog's biting me in the back of the legs. I – I tried to know away from – knock the dog away while all this was going on, and –

Q:    Okay. And how did you try and knock the dog away?

A:    I swung at it or something, trying to get it to get away from me. And I'm telling him to get his dog off of me.

Q:    And is he saying anything to you at this point?

A:    He's like – you know, finally announced that he was an officer at this point.

. . . .

Q:    Did you ever swear at Office Beebe?

A:     Oh, I'm I probably did and all that.

(*Id.* at 96:12-25, 97:1; 97:19-25; 98:1-7; 98:14-25; 100:18-25, 101:1; 101:14-21; 102:8-12; 102:19-25; 104:8-17; 158:16-17).

Beebe completed a police report for the City of Inkster Police Department, where he recounted his version of events:

> As we headed towards the vehicles, the staff at Ramchargers advised that the suspect male had been "kicking the shit out of the girl" and "knocked her to the ground."
>
> As we approached, I observed the male trying to get the car (with a childs seat in the back) out of the ditch with the help of a red pickup, the alleged female victim sitting in the passenger sear of a second pick up truck with an open passenger door and dirt on her jeans. I made contact with the female who was visibly upset, crying, breathing heavily, and in worried conversation with what sounded like a friend on her cell phone. I identified myself as a police officer, she told her friend the copes were there and hung up. I asked her if she was injured/hurt and she stated "He shouldn't have hit me" then stated nothing was wrong, quickly changing her story.
>
> As I turned around, I discovered that as a result of a gathering crowd and an escalating argument, K9 Yager had deployed himself out of a 1/2 open window of my truck and was now calmly standing by my side. The suspect male was approaching the female and at the time I did not feel that leaving the situation to return to the truck would be the best course of action.
>
> As the male approached I identified myself as a police officer and advised I would like to ask him a few questions about the incident. At which time he replied "Fuck you." I advised him again and again he replied "Fuck you, you aint a cop and cant do shit." The male suspect than [sic] proceeded to grab K9 Yager by the throat in an attempt to choke him adding that "You should take your dog with you." At that time K9 Yager did not engage the suspect. I grabbed the suspects hand to remove it from the dog, at which time the suspect took multiple swings at [me]. As I began to struggle with the suspect, K9 Yager trained in handler protection, bit onto the pants of the suspect in an attempt to pull the suspect off [me], I immediately called the dog out as I gained control of the suspect with a wrist lock, who was not trying to flee. The struggle took place in front of the second pick up on the scene. The female attempted to join the struggle to release her boyfriend, however was pulled back by witnesses. [I] placed handcuffs on suspect and detained him until Taylor PD arrived. Once the suspect was secured by [me] he dropped to the ground and started kicking at [me] and K9 Yager.

(Pl. Br. Ex. 7, Beebe Narrative Report).

As to the encounter, Rekuc testified that Beebe arrived, pulled his pickup near the car in the ditch, and brought out some "straps," apparently to assist Plaintiff in extracting his car. (Rekuc Dep. 23-24). Rekuc saw Cho sitting in the car that was still in the ditch (*Id*. at 24). Beebe approached Plaintiff's car, put his hands on the roof, and started talking to Cho. (*Id*. at 24, 28). Rekuc then observed Plaintiff walking up to Beebe from behind. (*Id*. at 25, 28). Rekuc could not hear Beebe and Plaintiff's conversation. However, Rekuc testified that Plaintiff "just started swinging at [Beebe] and telling him – I heard him yelling, 'You're not a police officer'." (*Id*. at 25:18-21).

William testified the following as to the incident between Plaintiff and Beebe:

> A: At that time Jim Beebe got out of the car. We all got out of the car. As a matter of fact, it was me and Scott and Jim – do you want me to keep going?
>
> Q: Yeah.
>
> A: Okay. Jim Beebe went to the car where the lady was setting at. He told her he was a police officer and asked if she was okay. She said, Yes, but he just kicked me, he was kicking me and hitting me. He said, Who? And she said, My boyfriend. At that time, the other gentlemen come up behind Beebe and asked him what the –
>
> Q: You can say it.
>
> A: What the hell he thought he was doing. And Beebe also at that time told him, I'm a police officer, stand back. Let me make sure she's okay and then I'll talk to you. Well, then it became a shouting match and name calling and a shoving match from the gentleman to Mr. Beebe. At that time, the dog come out the window of the truck, his police dog, doing the job that's he supposed to, to protect him, and grabbed a hold of the guy. We got the dog off. The guy kept on fighting and wrestling around the car trying to get away, and the dog kept doing his job, just trying to . . . . We finally got the dog. We put it back in the vehicle and put all the windows completely up. By that time I think Taylor police were on their way too. Officer Beebe handcuffed the guy. But we all kept telling him, Stay down, don't do nothing, he's a police officer. He was kind of like a wild man, he just didn't have no respect for nobody.

(W. Lewis Dep. 10:9-25, 11:1-16).

Beebe testified to the following concerning the incident with Plaintiff:

A:    I exited my truck. I gave the phone back to Scott. I told him to call 911. I shut my truck door, and I walked over to where the cars were.

. . . .

Q:    So you approached Ms. Cho; what did she say to you?

A:    She was talking' on a cell phone to somebody. She was physically, visually to me, upset.

Q:    Okay.

A:    She was rambling on the cell phone to some third party that he doesn't have the right to hit her like that. So – and that she – she he doesn't have the right to hit her; there's no reason for him to hit her. She stopped her conversation, and says, "Hold on, there's somebody here."

Q:    Okay. And what did you say to her?

A:    I asked her if she was okay, again, because she's verb – upset. She was crying. I asked her if she was okay. She said, "He doesn't have the right to hit me like that." I told her that I understand that. I identified myself to her as a police officer. As soon as I said that I was a police officer, she responded, "Nothing happened."

Q:    Where was [Plaintiff] at that point?

A:    [Plaintiff] was attempting to get his vehicle out of the ditch, I believe.

Q:    Did he appear to be a threat to you or to Ms. Cho? Or to anybody on the scene?

A:    When I approached her, no, he was not near me.

Q:    Okay. Where was your dog at this point?

A:    As far as I knew, my dog was in my truck where I left him.

Q:    And your dog was not at your side at that point?

A:    No.

. . . .

A:    I saw I was being approached by a white – a white gentleman. I took a step back. At the time I took a step back out of the apex of the door to where I was standing with her, that's the time that I realized my dog was next to me. I physically did not bring him out of the truck with me, nor did I order him out of the truck with me. Whether he got our over an open window, or came out with Scott or Dale, I don't know.

. . . .

A:    I was greeted by Mr. Mullins with an "excuse me, who the fuck are you?"

Q:    What did you do when he said that?

A:    I advised [Plaintiff], I was like, "Hey, I'm an off-duty police officer. I was told there's some kids in the car. I was checkin' on the well-being." He told me I wasn't a "fuckin' cop; to fuckin' mind my own business and leave him the fuck alone," quote/unquote.

Q:    Did you have any identification on you to show that you were a police officer?

A: No, I didn't, and I again reiterated, like, "Look, man, I'm serious. I'm an off-duty police officer. All I want to do is make sure the kids are okay." That was it.

Q: He didn't believe you, apparently.

A: No, he didn't, and he – it escalated from there.

Q: What happened next?

A: [Plaintiff], in his ex – exciterance (sic) and his cussin' his profanities at me, telling me to "fuckin' leave," he reached down, put both hands on my dog and told me I could take my "fuckin' dog with him (sic)," and threw the dog – tried to throw the dog back.

Q: And then what did you do?

A: I put my hand on his arm to get his hand off my dog and he took a swing at me.

Q: And then what happened next?

A: A fight ensured.

Q: Okay. Did [Plaintiff] say anything while – during this struggle?

A: "Get the fuck off me."

Q: Was he yelling, "Someone call the police?"

A: Yeah, and I told him I was already there.

Q: All right. Did you finally get him down?

A: After a few minutes of struggle, yes, I did.

. . . . .

Q: Okay. You finally did get him down on the ground.

A: Yeah, we finally hit the ground.

Q: Okay. And what happened next?

A: We were still fightin' on the ground.

Q: At what point did your dog get involved?

A: My dog was involved, as far as I best recollect, the – the minute the fight ensued; that's what he's trained to do.

Q: Was there a command give for –

A: No.

. . . .

A: He's trained in handler protection. This is a handler protection incident.

Q: How long would you say the struggle took, time – time-wise?

A: Probably 2-3 minutes. It was a good one.

. . . .

Q: Okay. Was Ms. Cho involved in that fall?

A: Yeah, 'cause she's tryin' to – she tried to jump on me.

Q: Okay. So she was knocked over?

A: Yes.

. . . .

Q: Was your dog biting [Plaintiff] at this point?

A: I know he was in the vicinity.

. . . .

Q:      Okay. Do you think you – you required the K-9 on this situation?
A:      No, I did not deploy the dog.
Q:      Okay, I – I – I thought the dog worked on commands.
A:      The dog does work on commands.

. . . .
Q:      Okay. How did he get out?
A:      I don't know.
Q:      Okay. Did you tell anyone – either one of the Lewis', who you left in the truck, not to let the dog out?
A:      Yes.
. . . .
Q:      Okay. When did you finally show [Plaintiff] your badge?
A:      After I got him under control, handcuffed.
Q:      Handcuffed? Was he on the ground?
A:      Uh-huh.
Q:      Did – did you – who got your badge for you?
A:      I sent Scott back to the truck to get it.
Q:      Okay. And where was the dog at this point?
A:      I told Scott, "Take the dog back to the truck."
Q:      Okay. Did you hit [Plaintiff] in the face with your badge?
A:      On the forehead, yes.
Q:      How many times?
A:      I believe only once.
Q:      And what'd you say to him when you did that?
A:      He was making a complaint that he couldn't read my badge, and he was cussin' and swearin' at me, he couldn't see it, he couldn't see it.

(Beebe Dep. 25:19-21; 26:11-25, 27:1-11; 28:2-9; 28:13-25, 29:1-21; 30:5-13; 30:19-22; 31:17-20; 32:6-7; 32:15-19; 33:7-11; 34:10-25)

At some point after Plaintiff had been handcuffed, the City of Taylor Police arrived in response to a call. Officers Johnson and Thivierge arrived on the scene and took Plaintiff into custody for domestic violence.

Plaintiff was subsequently arraigned on charges of domestic violence and resisting/obstructing a police officer. Both charges were eventually dismissed.

State Case

On January 20, 2005, Plaintiff filed a lawsuit in Wayne County Circuit Court, alleging

the following causes of action against the City of Inkster, Inkster Chief of Police Marvin

Winkler, Beebe, the City of Taylor, Taylor Chief of Police, and Taylor police officers Thivierge,

Johnson, and Raboczkay:

| | |
|---|---|
| Counts I-III: | Defamation (Beebe, Thivierge, and Johnson) |
| Counts IV-VI: | Intentional Infliction of Emotional Distress (Beebe, Thivierge, and Johnson) |
| Counts VII-IX: | False Arrest and False Imprisonment (Beebe, Thivierge, and Johnson) |
| Counts X-XII: | Assault and Battery (Beebe, Thivierge, and Johnson) |
| Counts XIII-XVI: | Malicious Prosecution (Beebe, Thivierge, Johnson, and Raboczkay) |
| Counts XVII-XXIII: | Violation of Michigan Constitution (Inkster, Winkler, Beebe, Taylor, Raboczkay, Thivierge, and Johnson) |
| Counts: XXIV-XXV: | Inadequate Training and Supervision (Inkster and Taylor) |
| Counts XXVI-XXVII: | Ratification (Inkster and Taylor) |
| Counts XXVIII-XXIX: | Condoning Reckless Behavior (Inkster and Taylor) |
| Counts XXX-XXXI: | Respondeat Superior / Agency (Inkster and Taylor) |

(Supp. Ex. 1, State Court Complaint); *Mullins v. City of Inkster*, No. 05-501840-NO (Wayne

County Cir. Court Aug. 22, 2006). On March 17, 2005, Plaintiff was permitted to amend his

Complaint to add a claim of negligence. (Supp. Ex. 2, Amendment).

In regards to Inkster, Plaintiff alleged in Count XXIV of the state complaint that it: (1)

maintained a custom and policy of improper training and supervision of their officers; (2)

retained police officers with a known history of violating the laws and the Michigan

Constitution; (3) knew that Beebe had a history of violating the laws and the Michigan

Constitution; (4) trained Beebe; (5) acted with deliberate indifference to Plaintiff under the

Michigan Constitution; and (6) failed to discipline Beebe as a result of the incident.

<u>The Instant Federal Case</u>

On September 7, 2005, Plaintiff filed the instant federal case. Plaintiff alleged three

claims under 42 U.S.C. § 1983 and a claim of gross negligence under state law against the same

defendants. Plaintiff indicated on the cover of the Complaint that there was a related civil action pending in Wayne County Circuit Court.

On October 5, 2005, Defendants' attorney in the state case, Margaret T. Debler, sent a letter to Plaintiff's counsel referencing a supposed agreement between the parties to dismiss the state court action and bring the entire case in federal court:

> I am not able to accept service of the Federal Court Complaint that you recently filed on behalf of your client. Therefore, you must personally serve Inkster Defendants you wish to include as parties in this matter. I have not reviewed the Complaint, but based on Ms. Puzzuoli's September 30, 2005 letter to you, it is my understanding that it includes allegations inapplicable to the factual scenario on which your client's claims are predicated. For this reason, and because it was my understanding that you were going to include the currently-pending state law claims into the Federal Court complaint, and thereafter dismiss the State Court action, you may wish to amend your complaint. Please advise me as to the course of action you intend to take.

(Pl. Supp. Ex. 2).

On October 11, 2005, defendants Inkster, Beebe, and Winkler filed a motion for summary disposition in the state court action. (Supp. Ex. 3). Defendants argued that: (1) Inkster and Winkler were entitled to governmental immunity under Michigan law; and (2) Beebe had probable cause to arrest Plaintiff, used a reasonable amount of force in the arrest, did not initiate the criminal charges filed against Plaintiff, did not commit extreme and outrageous conduct, and did not defame Plaintiff. (*Id*.).

On November 23, 2005, Plaintiff filed a Response to the defendants' motion. (Supp. Br. Ex. 4). In support of his argument that Inkster was not entitled to governmental immunity, Plaintiff quoted the following passage from the Michigan Court of Appeals decision in *Davis v. Wayne County Sheriff*, 201 Mich. App. 572, 581 (1993):

> Just as our Supreme Court applied the *Canton* "deliberate indifference" standard to a deprivation of rights in the context of inmate suicide, we believe that liability for an officer's off-duty conduct that results in death or bodily injury to citizenry

may only be imposed where that officer's conduct is directly related to a policy, or lack of policy, adopted, or not adopted, with deliberate indifference to the rights of citizens.

Therefore, immunity is not available to the city nor its chief.

(Supp. Ex. 4, Plaintiff's Response). The *Davis* case involved an appeal of a jury verdict involving § 1983 municipal liability claims. 201 Mich. App. at 574-76. In other words, Plaintiff argued in his responsive pleadings essentially that Inkster was not entitled to state law immunity because he was proceeding on a federal § 1983 theory of failure to train/supervise and unconstitutional policy theories – to which Michigan's governmental immunity statute does not apply.

The parties subsequently stipulated to dismiss the Taylor defendants. (Supp. Exs. 5-6).

On January 6, 2006, the state court granted summary disposition to Inkster and Chief Winkler, and granted in part and denied in part summary disposition to Beebe:

The Defendant, City of Inkster, James Beebe, and Marv[in] Winkler have filed . . . . a motion for summary disposition pursuant to MCR 2.116(C)(7), (8), and (10) of the claims of Plaintiff, Charles Scott Mullins.

The City of Inkster claims that it is entitled to summary disposition . . . . of all of Plaintiff's common law claims because they are barred by governmental immunity set forth in MCR 691.1407(1). The City of Inkster also argues that there is no respondeat superior liability for common law torts, unless there is a statutory exception to governmental immunity which does not apply to this case.

It is well established in Michigan that the management, operation, and control of a police department is a governmental function. Absent any statutory exception, a municipality is immune from tort liability arising from the police department's exercise or discharge of a governmental function. Clearly, for all of Plaintiff's common law claims, there is governmental immunity for the City of Inkster because none of the statutory exceptions apply.

A governmental agency cannot be held liable vicariously or under a theory of respondeat superior, where an employee or agent commits a tort while in the exercise or discharge of a governmental function.

. . . .

With respect to all the individual Defendants, it is clear that they were acting within the course and scope of their employment. Therefore, the Defendant, City of Inkster, cannot be held liable under a theory of respondeat superior.

. . . .

However, Plaintiff further argues that the City of Inkster is not entitled to governmental immunity because it acted with deliberate indifference[.] The deliberate indifference standard only applies to alleged violations of constitutional rights as protected by 42 U.S.C. § 1983. It does not apply to common law claims.

The Defendant, City of Inkster . . . .  is entitled to summary disposition under MCR 2.116(C)(7), (8), and (10) based on governmental immunity from common law tort claims.

. . . .

There is an issue of fact as to whether Plaintiff or Beebe initiated the assault. The motion for summary disposition under MCR 2.116(C)(10) as to Beebe is denied.

(Summ. Disp. Tr. 12/16/05, 5-8; Pl. Supp. Ex. 1, Order).

The case was set for trial in state court for June 12, 2006. On June 9, 2006, the state trial court was informed by the parties that the case had settled as to the remaining case. The state court scheduled an "intent to dismiss" hearing for August 14, 2006, and sent the required "notices of intent to dismiss" to the parties on July 6, 2006. The parties apparently neither appeared at the August 14 intent to dismiss hearing, nor submitted a proposed final order or a stipulation to dismiss. On August 22, 2006, the state court case was dismissed pursuant to the court's order:

This cause coming regularly before the court and no order or judgment having been presented within the ten (10) day period following adjudication by the court and proper notice of impending dismissal having been mailed it is ordered that the above entitled case is hereby dismissed.

(Doc. No. 68, 8/22/06 Order).

Neither party filed a motion for reconsideration, or an appeal of this decision.

On March 31, 2007, Plaintiff filed an Amended Complaint in this Court, asserting the following causes of action against Defendants Inkster and Beebe:

| | |
|---|---|
| Count I: | 42 U.S.C. § 1983 (Beebe) |
| Count II: | 42 U.S.C. § 1983 Failure to Train & Supervise (Inkster) |
| Count III: | 42 U.S.C. § 1983 Unconstitutional Policy (Inkster) |
| Count IV | Gross Negligence (Beebe) |

In August 2007, Inkster filed a motion for summary judgment.

Having been made aware of the prior/concurrent state court case, this Court ordered that Plaintiff and Inkster submit the pleadings, orders, and transcripts of the state court case. After reviewing the state court pleadings, the Court additionally requested that these parties submit supplemental briefs on whether res judicata and/or collateral estoppel preclude Plaintiff's claims against Inkster. Both parties submitted supplemental briefing.

## II.    ANALYSIS

### A.    Summary Judgment Standard

The United States Court of Appeals for the Sixth Circuit has summarized the relevant legal standard for a summary judgment motion:

> Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing a motion for summary judgment, we view the evidence, all facts, and any inferences in the light most favorable to the nonmoving party. "To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact." A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."

*Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 500-01 (6th Cir. 2007) (internal citations omitted).

### B.    Res Judicata / Collateral Estoppel as to Inkster

Plaintiff filed two separate lawsuits arising out of the same set of facts – a state lawsuit on January 20, 2005, and the instant federal lawsuit on September 7, 2005. Plaintiff asserted state claims in the state court, and his federal claims in federal court. Most, if not all, discovery was conducted in connection with the state case. The parties litigated the state case through the summary disposition phase – where Inkster was granted summary disposition. However, since the ultimate state court dismissal of the case was without prejudice, this Court cannot apply Michigan preclusion doctrines to bar Plaintiff's claims against Inkster.[3]

---

[3]     It is clear that Plaintiff could have brought his entire case in state court. *See, e.g., Gordon v. Sadasivan*, 144 Mich. App. 113, 119 (1985) (recognizing that Michigan state courts enjoy concurrent jurisdiction over federal § 1983 claims), or in federal court, invoking the Court's supplemental jurisdiction under 28 U.S.C. § 1367. Instead, Plaintiff decided that it was to his advantage to take two bites at the apple.

Hence, the Court must determine whether the doctrines of res judicata and/or collateral estoppel bar Plaintiff's instant claims against Inkster.

The Full Faith and Credit Act, 28 U.S.C. § 1738, directs a federal court to apply the preclusion law of the state where the judgment was entered. *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380 (1985). "Consequently, if the state would accord the judgment preclusive effect, then the federal court must also give the judgment preclusive effect unless Congress has expressly or impliedly created an applicable exception to § 1738." *Maiden v. Rozwood*, 215 F.3d 1327, 2000 WL 712537, *2 (6th Cir. May 23, 2000) (unpublished table opinion). The Supreme Court has held that res judicata and collateral estoppel apply to actions under § 1983. *Allen v. McCurry*, 449 U.S. 90, 103-05 (1980).

The Michigan Court of Appeals has recently summarized the doctrines of res judicata and collateral estoppel:

> The doctrine of res judicata (also known as claim preclusion) is employed to prevent multiple suits litigating the same cause of action. The doctrine bars a second, subsequent action when (1) the prior action was decided on the merits, (2) the matter in the second case was, or could have been, resolved in the first, and (3) both actions involve the same parties or their privies. "This Court has taken a broad approach to the doctrine of res judicata, holding that it bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not."
>
> . . . .

Therefore, the Court will proceed to the merits of Plaintiff's § 1983 claims against

Inkster.

---

> Collateral estoppel, also known as "issue preclusion," applies when three elements have been met: "(1) 'a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment'; (2) 'the same parties must have had a full [and fair] opportunity to litigate the issue'; and (3) 'there must be mutuality of estoppel.' "In contrast to res judicata, "[c]ollateral estoppel conclusively bars only issues 'actually litigated' in the first action." "A question has not been actually litigated until put into issue by the pleadings, submitted to the trier of fact for a determination, and thereafter determined."

*Michigan Dep't of Transp. v. North Central Co-op., LLC*, – Mich. App. –, 2008 WL 204117 (2008) (internal citations omitted).

However, the parties did not receive a final judgment in the state court on the claims against Inkster. In Michigan, a grant of summary disposition is a final ruling on the merits for preclusion purposes. *Capital Mortgage Corp. v. Coopers & Lybrand*, 142 Mich. App. 531, 536 (1985). However, a grant of partial summary disposition does not constitute a final judgment as to the winning party until the entry of a final judgment. *See* Mich. Ct. R 2.604(A).

On January 6, 2006, the state trial court granted summary disposition to Inkster, but denied summary disposition to Beebe. The parties then informed the state court that the remaining case had "settled" a few days before the scheduled trial date. However, the parties did not submit a final proposed order or a stipulation of dismissal. After noticing the parties of an intention to dismiss, the state court entered an order dismissing the case.

The state court did not indicate whether the dismissal was pursuant to Mich. Ct. R. 2.504(B)(1), or "lack of progress," or Rule 2.502(B)(3). Under the Michigan Court Rules, a dismissal for "lack of progress" is "without prejudice" unless the court otherwise indicates in its order. Mich. Ct. R. 2.504(B)(1). A "lack of progress" dismissal does not act as an adjudication on the merits for preclusion purposes. *Caughey v. Rozycki,* 22 Mich. App. 317, 318 (1970); *see Minns v. Rose*, No. 261436, 2005 WL 1966322, *1 (Mich. Ct. App. Aug. 15, 2005) (unpublished) (reversing the trial court's determination that a "lack of progress" dismissal operated as a res judicata bar).

On the other hand, if the reason for the state court's dismissal was because of the failure of the parties to appear, or otherwise to comply with the court's order pursuant to Rule 2.504(B)(3), the dismissal would act as an adjudication on the merits.

On summary judgment, the Court must provide the benefit of the doubt to Plaintiff. Since neither party has explained, or otherwise provided information concerning, the precise circumstances of the ultimate state court dismissal, this Court will assume that the state court dismissed the case for lack of progress – which does not trigger a res judicata or collateral estoppel bar since the state court case never reached a valid and final judgment.

### C. Municipal Liability Claims under § 1983

Plaintiff contends that Inkster is liable under § 1983 since it lacked policies and training concerning the use of K-9s. Plaintiff maintains that Inkster lacks adequate policies and training for the uses of K-9 units in the possession and control of off-duty police officer handlers.

Plaintiff cites Inkster's "2003 Annual K9 Report" to show that K-9 Yager had previously, on one occasion, jumped through a half-open vehicle window to assist officers in a physical struggle with a suspect:

> On the following day, as a result of a traffic stop and the discovery of marijuana in the vehicle, myself, Ofc Vargo, and Aux Ofc McPhetters were involved in a struggle [with] the driver, resisting arrest. During the fight, Yager self-deployed from my patrol unit through the half open drivers window and engaged the suspect. The suspect was subsequently handcuffed and arrested. Over 120gs of marijuana was discovered in the suspect's jacket.

(Pl. Br. Ex. 3, Inkster 2003 Annual K9 Report). Beebe's police report of the incident indicates that "[d]uring the fight, K9 Yager deployed out of the [vehicle] and engaged the fighting suspect." (Pl. Br. Ex. 5, 11/29/03 Police Reports). Another officer on the scene reported that "[d]uring the duration of the struggle/fight K-9 Yager exited vehicle 138 and bit [the suspect] on the right forearm. . . . Per the doctor at Concentra the dog bit[e] was a minor laceration[.]" (*Id*.).

On August 3, 2006, Nakina Knight filed a citizen complaint with the Inkster Police Department concerning the use of the K-9 Unit. (Pl. Br. Ex. 6, 8/3/06 Complaint). Knight indicated that the Inkster police responded to an argument between Knight and her husband at their home. The attached citizen complaint, however, does not include the circumstances of the K-9's deployment in the situation. On November 17, 2006, Gregory B. Gaskin, from the Chief of Police's Office, responded that "your complaint regarding the use of the Police K-9 has indicated a Policy failure concerning the deployment of the Police K-9. We will review our policy for possible changes as a result of its failure to adequately address the situation." (*Id*.).

Then-Chief of Police Marvin Winkler testified the following as to the training of K-9

handlers and city policy:

> Q: Okay. What are the general requirements that you remember?
> A: Well, they'd have a good work record, lack discipline, able to care and keep the canine at home. Able to interface and train with the canine. And complete all ongoing training as prescribed.
> Q: Are there special training requirements?
> A: Yeah, for canine activity they have to be certified.
> . . . .
> Q: So it is the handler's responsibility to keep the animal secure whether he leaves it in a vehicle, at home or wherever he leaves it?
> A: Yes.
> Q: And I believe you said this, but I just want to be sure. Can anyone else give a command to that animal?
> A: You shouldn't be able to. That's what I stated.
> . . . .
> Q: He has had other incidents, other than this one that you are familiar with?
> A: I believe there was. I can't recall. But I believe Yager has bitten someone else.
> . . . .
> Q: On more than one occasion?
> A: No. It wasn't that often when I was there. But I remember one other one vaguely.
> Q: Was he on duty when that occurred?
> A: I believe he was.

(Def. Br. Ex. H, Winkler Dep. 13:22-25, 14:1-6; 21:25, 22:1-8; 31:19-22; 31:25, 32:1-4).

Turning to the actual written policies themselves, Inkster's Use of Force Policy relates

the following in regards to canine units:

> (8) Use of Canine (K-9)
> . . . .
> > (b) General Use of K-9
> > - The K-9 shall be used in various law enforcement situations in accordance with the training received by the K-9 unit.
> > - The K-9 shall never be used to attack or injure any person who has been restrained, who is under physical control or who presents no threat to anyone's safety.
> > . . . .
> > (d) Assault on K-9
> > - Any assault on the handler or dog will result in an automatic response of aggression from the dog.

- During an automatic response of aggression, the handler will "call out" the dog immediately after the person committing the assault has been restrained or poses no further threat of safety to the K-9.

(Pl. Br. Ex. 4, Use of Force Policy).

The Inkster Police Department maintained a K-9 Policy in effect at the time of the incident. The relevant provisions include:

II.     POLICY

Because of a superior sense of smell and hearing and potential for aggressiveness, the trained law enforcement canine is a valuable supplement to police manpower. However, utilization of canines require adherence to procedures that properly control their use of force potential and that channel their specialized capabilities into legally acceptable crime prevention and control activities.

. . . .

IV.     PROCEDURES

A.      Canine Unit Utilization

1.      Canine teams are available on a 24-hour, on call basis. They should, when working to be dispatched to calls best suited for their use. They should be used as back-up units, and should be dispatched routinely as any other patrol unit. Primary use of the canine unit would be to:

a.      Conduct building searches for offenders in hiding
b.      Assist in the arrest of serious or violent offenders, and to prevent the escape of a subject who is fleeing lawful arrest.
c.      Protect officers or others from death or serious injury.
d.      Track suspects, or locate lost or missing persons.
e.      Locate hidden instrumentalities or evidence of a crime.
f.      Assist in the execution of search warrants.
g.      Detect the presence of concealed narcotics.

. . . .

3.      Canine handlers are responsible for determining whether a situation justifies canine use and the appropriate tactical measures that should be taken. Where the on-scene

supervisor disagrees with the handler, directions of the on-scene supervisor *shall* be followed.

    a.    Police canines shall not be handled or given commands by anyone other than the assigned handler. Should the assigned handler be injured or otherwise unable to command, another canine handler shall be contacted for assistance.

(Def. Br. Ex. I, K-9 Policy). The policy further indicates that a canine handler must have the following minimum qualifications: (1) one year as a uniformed officer with a satisfactory work performance, disciplinary, and medical leave records; (2) a willingness to care for and house the canine at the handler's residence; (3) a desire to care for and to train the canine; (4) ability to pass physical fitness and agility tests; and (5) have an enclosed and secure facility in which to store the canine vehicle. (*Id*.).

A municipality cannot be found liable under § 1983 unless the plaintiff can establish that an officially executed policy, or the toleration of a custom leads to, causes, or results in the deprivation of a constitutionally protected right. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978).

A "custom" for purposes of *Monell* liability must "be so permanent and well settled as to constitute a custom or usage with the force of law." In turn, the notion of "law" must include "[d]eeply embedded traditional ways of carrying out state policy." It must reflect a course of action deliberately chosen from among various alternatives. In short, a "custom" is a "legal institution" not memorialized by written law.

In addition to showing that the [municipality] "caused" the constitutional violation, plaintiff must also show a direct causal link between the custom and the constitutional deprivation; that is, she must "'show that the particular injury was incurred *because* of the execution of that policy.'" This requirement is necessary to avoid *de facto respondeat superior* liability explicitly prohibited by *Monell.*

. . . .

To state a municipal liability claim under an "inaction" theory, [a plaintiff] must establish:

> (1)     the existence of a clear and persistent pattern of [constitutional violations] by [its] employees;
>
> (2)     notice or constructive notice on the part of the [municipality];
>
> (3)     the [municipality's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
>
> (4)     that the [municipality's] custom was the "moving force" or direct causal link in the constitutional deprivation.
>
> The *Monell* custom requirement is an essential element of this claim. The evidence must show that the need to act is so obvious that the [municipality's] "conscious" decision not to act can be said to amount to a "policy" of deliberate indifference to [the plaintiff's] constitutional rights. "Deliberate indifference" in this context does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference to [the constitutional violation].

*Doe v. Claiborne County, Tennessee.*, 103 F.3d 495, 507-08 (6th Cir. 1996) (internal citations omitted). "[T]he plaintiff bears a heavy burden in proving municipal liability, and he cannot rely solely on a single instance to infer a policy of deliberate indifference." *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005).

Even assuming that the allegations concerning Beebe's conduct constitute a "constitutional violation," Plaintiff has not demonstrated that Inkster is liable under § 1983.

Initially, the record shows that Inkster developed and promulgated policies addressing canine handlers. Plaintiff contends rather that Inkster failed to have policies addressing canine procedures when the handler is "off-duty" and dealing with a possible domestic violence situation. Plaintiff offers two examples of Yager's allegedly unconstitutional use: (1) a 2003 incident where Yager self-deployed through a half-open window to assist the officers in subduing a suspect resisting arrest; and (2) a 2006 incident where apparently Yager was employed by the officers in a possible domestic violence situation.

The Court finds that Plaintiff has failed to show "the existence of a clear and persistent pattern of constitutional violations" and that Inkster was deliberately indifferent in failing to act. First, it is not clear that either the 2003 or 2006 incidents constituted constitutional violations; and moreover, they are not analogous to the instant case. In the 2003 incident, Yager self-deployed to assist the officers in subduing a suspect resisting arrest. The officers were all on-duty and in uniform. Regarding the 2006 incident, it is not even apparent from the record what transpired.

The Court finds that these two incidents to not create a "clear and consistent pattern." Even if these two incidents could constitute a "clear and persistent pattern," there is no evidence that Inkster was deliberately indifferent, or tacitly approved of the conduct. In fact, the Inkster Police did order an internal investigation of Yager's use in connection with Plaintiff's arrest. (Winkler Dep. 23-24). The 2006 incident, which appears to have no factual similarity to the instant case except that a police dog was involved, was also investigated.

Since the evidence in the record does not establish a genuine issue of material fact as to whether Inkster is liable under § 1983, the Court GRANTS Inkster's motion.

## III.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Inkster's Motion for Summary Judgment.

Plaintiff's remaining § 1983 and gross negligence claims against Beebe will proceed to trial.

**SO ORDERED.**

          s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  March 3, 2008

CERTIFICATE OF SERVICE

Copies of this Order were served on the plaintiff and  attorneys of record by electronic
means or U.S. Mail on March 3, 2008.


s/Denise Goodine
Case Manager